We move to the fourth case this morning, PMT Machinery Sales v. Yama Seiki. Good morning. My name is Chris Strabutosky, and I represent PMT in this case, the appellant. In connection with this case, the issue, as we see it, focuses squarely on the district court's analysis of the ability to sell question. And the district court relied on two cases, the Forster case from the Wisconsin Supreme Court, and the John May case from this court, both written by Judge Coffey. Now, in those two cases, the courts both concluded that manufacturers' representatives were not dealers for the purpose of the Fair Dealership Act. And we believe that the central issue, the central mistake that was made by the district court in this case, is the very core question of whether or not PMT had the right to sell based upon the factual record that was presented on the summary judgment motion. Here are the distinctions that we believe are critical. The first, in the Forster case, there was a written contract which specifically precluded Forster from directly dealing with customers to negotiate price. That was something that the manufacturer did. Second of all, in the John May case, in that particular case, once again, the direct decision, direct negotiation, with respect to the transaction, occurred at Nordsten, not at John May. In fact, the manufacturer's rep's jobs were essentially to generate leads and promote acceptance of the product, and that is right in those cases. The difference, and it's very significant with respect to PMT, is this. PMT had the customer contact. PMT negotiated the price. PMT was required to install, train, do warranty work, and negotiate the final price on the product. That is squarely the right to sell under the statute. And the problem that I have personally with the district court's decision in this case is this. The fact that PMT had the ability to sell was admitted by PMT's general manager, Mr. Wang. In his affidavit, which was filed, by the way, in reply, which is the record reference 38 at page 2, he said two things. The first thing he said was, even though we took the exclusivity away from PMT, they still had the right to sell our products. The second thing he said was, we've never turned down PMT's sale ever. In his deposition, he described the process. The process was this. PMT would go to a customer, have a list of machines. They would then ask for a price, which they were given. If they presented Yamasaki with a sales price greater than the price by the customer presented to them as wholesale, and that was submitted, it was accepted. That's a right to buy. That's a right to sell, squarely in the case. In this instance, the district judge seemed, as I recall, to focus on the fact that while Yamasaki, while you all would do the price negotiations, Yamasaki reserved the right to approve or disapprove the sale. In that instance, your honor, I think the factual record does not support that conclusion. I don't believe that the factual record in this case supports that conclusion at all. In fact, what Yamasaki did was required purchasers to purchase in a certain way. In other words, they had to pay a certain amount with the order. They had to pay a certain amount on shipment. They had to pay a certain amount on acceptance. Whom did they pay? The payments were made to Yamasaki. What money passed through PMT's hands? PMT did not have any money passed through its hands. I got to say, that sounds to me a lot more like a manufacturer's rep than a dealer. Did PMT carry any inventory of Yamasaki product? PMT itself only purchased Yamasaki, I'm sorry, PMT's sister company only purchased on behalf of PMT's customers' machines when the customers did not want to purchase under the rules established with respect to, for example, how payments were made. It was bought by PMT Precision Machine, which is PMT's sister company, and then was transferred to the customer. In those instances, yes, there was an inventory, but was there an inventory that was maintained? The answer is no. The issue here is when you take this situation and you look at, for example, the Benson case, which is the most recent Wisconsin Supreme Court case on this issue. In Benson, the golf course professionals, and I must admit that when I read that case, I kind of went, yeah, how can this be? I will say it surprised me, but it shows, I think, how broadly Wisconsin construes this law. And since this court is sitting in diversity jurisdiction, it has to rule in a way that would be consistent with Wisconsin law. When the city says, here's how much you charge to pay golf. You have to charge this much for somebody to play golf here. You collect it and give the money to us, and that's still a dealer. To me, there's just no way to reach the conclusion that is reached in this case, because there are things that happen that are in the record. For example, in the Benson case, the golf professionals sold things like t-shirts and rented equipment, things like that. Well, in our case, the record shows that PMT had add-on purchases that didn't come with Yamaseki for specific installations, not unlike the Benson case. And I believe that the district court was wrong in its decision here, but even the most recent case that was presented to this court, well, they recently certified a case, and it's a left bank, it's a wine case. And it's a case that involves the line-item veto in Wisconsin, which in that particular case, the line-item veto used made the statute practically unreadable. And this court said, Wisconsin, you decide how to apply this statute. You're going to do it. It's up to you. You do it. Tell us how to do it, and we'll do it. In this particular situation, we have a very direct conflict between the current Wisconsin Supreme Court's decision on how dealerships are to be analyzed, and the previous decision in Forrester, and the previous decision of this court in John May. We believe that the Benson case shows quite clearly that the district court was wrong. But it's a question for a Wisconsin court to resolve if the answer is, was or wasn't they, were they, how do you apply Forrester and John May in light of Benson, and that's our position in this case. Wisconsin, the Wisconsin courts have clearly stated, have disavowed rigid rules in the application of the Forrester case. That's the Ziegler versus Ruxnord case that's cited in our brief. And we believe that the district court's actions in here is exactly that. That's a rigid enforcement of the Forrester case. So the Wisconsin Supreme Court has written, I think maybe it was just quoted in Benson, that there is quote, rarely an obvious answer, close quote, regarding status of a dealership. That is exactly what the court said, yes. And I guess at the risk of being flipped, how is what we're talking about here law? If there is rarely an obvious answer and there aren't, how do we, let me put it a different way, how do we tell the difference between a covered dealership and an excluded manufacturer's representative relationship? Well, on a summary judgment motion, I think the answer squarely is determined on who negotiates the sale. Based upon Forrester and John May, where the manufacturers negotiated directly with the customer. Here there was no customer contact other than by PMT. And I think that that's where you draw the line. It's less nuanced in that situation. And I think that on a summary judgment motion especially, the fact that it is nuanced says it shouldn't be a case that gets here on summary judgment. I think it's a case that should be resolved on factual matters. And good luck instructing the jury. Well, the jury instructions in these cases are very complicated. I will admit that, and especially when you need a unanimous jury. But the fact of the matter is that that's still the rule and that's what we're arguing for. And I would like at this time to reserve the remainder of my time for rebuttal. I thank you. Thank you. Good morning. If it pleases the court, my name is Randall Gass and I represent the defendant and appellee, Yamasaki USA Incorporated. The crux of this appeal is whether PMT can qualify as a covered dealership under the Wisconsin Fair Dealership Law. At the district court level, we move for summary judgment on three distinct grounds, which are all elements of the Fair Dealership Law. One, that there was no contract or agreement between the parties. Secondly, that PMT did not have the right to sell any Yamasaki product and made only de minimis use of Yamasaki's trade name and logo. The third prong of our summary judgment motion was that there was no community of interest between the parties. District court opted to rule solely on the basis of number two, that PMT had no ability to sell and the trademark use was de minimis and did not constitute a substantial investment in advertising. In its reply brief, PMT chastises Yamasaki for not presenting this court with any factual basis for saying PMT had no ability to sell or bind Yamasaki to a sale. It's difficult to prove something that doesn't exist. It's difficult to prove a negative. So Mr. Wang said that the plaintiff did have the right to sell. He said that they could sell, which in context means... What were his exact words? His exact words that they had the right to sell. Yamasaki took away the exclusive, but PMT still had the ability to sell Yamasaki product. Counsel, could you quote him, please? I can, Your Honor, if you'll excuse me for a moment. I think you have his declaration in the room. Thank you. Thank you, Your Honor. Mr. Wang is the operation manager for Yamasaki's Goodway division. And at paragraph six of his declaration, which is document 38 in the record, he said, and I quote, PMT retains the ability to the present day to sell Yamasaki machines, albeit on a non-exclusive basis. Yamasaki has never failed to recognize a machine purchase submitted by a PMT customer, nor has Yamasaki ever failed to provide a quote to PMT on any particular machine tool. That's the actual verbiage from the declaration. Thank you. That sounds like pretty good evidence to beat summary judgment on a right not having a right to sell. I don't think so, Your Honor. I think it's form over substance. The ability to sell is the ability to promote the sale because what the record reveals in this case is that PMT made no direct sale to any customer. None. They made or maintained no inventory of Yamasaki product to make any sale. All of the sales that were made via PMT's promotion efforts were based upon contracts entered into by Yamasaki direct with the end line customer. I'll grant you, PMT solicited that customer. I'll grant you, PMT negotiated the price. But all of the terms of the transaction were direct between Yamasaki and the end line customer. Title was transferred. The money was paid to Yamasaki according to Yamasaki's standard terms and conditions. PMT was not a party to that contract at all. They negotiated the sales price. What PMT's role was limited to here was promotional efforts only. They didn't sell anything. They didn't buy anything from Yamasaki to sell. And they made no sale to any end line customer. What their role was in this particular relationship was they would develop an end line customer lead. They would then obtain a price quote from Yamasaki, essentially a list price. And then go to the customer and say, and mark that up. And then third, the customer placed the order direct with Yamasaki. Yamasaki shipped to the customer. Yamasaki billed the customer. The customer paid Yamasaki. All according to Yamasaki's terms and conditions. And then what would happen in terms of the compensation PMT would receive is they would invoice Yamasaki for essentially what was called the profit for sale basis, essentially a commission. It was the difference between the list price quoted by Yamasaki to PMT versus what price PMT negotiated with the end line customer, which would be the amount of the purchase order that was issued to Yamasaki. And then Yamasaki would fulfill the purchase order and ship and bill the customer direct and transfer title direct to the customer. So when Mr. Wang speaks in terms of they could sell, they could essentially promote the sale because they had nothing to sell. They didn't buy any Yamasaki product. So we think that consistent with the Forrester decision and this court's John May decision, that PMT is essentially a manufacturer's representative. And I think one thing that Mr. Trebitoski said I think is really relevant in this case. They have to show one of two things to win, or at least qualify as a dealer under that element. That they sold something. Undisputed, they never did. Never sold anything. Everything was Yamasaki direct to the end line customer. Or they could satisfy that prong of the definitional element by saying, we have the ability to bind Yamasaki to a sale. They didn't have that either. Because you remember opposing counsel referenced there were certain situations where PMT's sister company, Precision Manufacturing, it's a sister company owned by the same guy, Ken Schertz. There were four occasions, four occasions, where the sister company, Precision, actually purchased Yamasaki machines. PMT never did, but a sister company did. And the only reason it did that on four occasions, and this is set forth in the record, Mr. Schertz's deposition testimony, Exhibit A to my declaration in support of the motion for summary judgment. The reason they did that, and this goes to the ability to bind issue. The reason they did that is because the customer and Yamasaki did not come to terms. The customer did not want to deal with Yamasaki. They didn't like Yamasaki's payment terms or for whatever reason. So there's no way PMT bound Yamasaki because on four occasions at least, the customer didn't strike a deal with Yamasaki. They didn't like Yamasaki's terms. So in order to salvage some kind of a transaction, what happened is the sister company, Progressive, bought four machines from Yamasaki. And then they resold them to the customers who walked away from PMT, or who walked away from Yamasaki because they didn't want to deal with Yamasaki. So there is no ability to bind. Otherwise, PMT could have bound those four people, those four customers. They could have bound them to Yamasaki and concluded the transaction. But they couldn't because the customer walked away. But they still wanted to salvage, so Precision bought them, different company, and sold, and then received the compensation based upon that difference between the list price and the price that the product was sold by Precision to the online customer. So there's no ability to sell. They can't bind us because it happened on four occasions. I think that's the best evidence, that they couldn't bind us. And the district court noted that in its decision. It said that the Precision situation was the exception rather than the rule. And the district court also said that whatever Precision did had no effect or bearing on PMT. They're separate and independent companies, although there is a common owner. Now, we believe that in this case, the district court correctly relied upon Forster Incorporated versus Atlas, a Wisconsin Supreme Court decision, and this court's, the circuit's, decision in John May versus Norton. Forster promoted the sale of contract metal stampings on behalf of Atlas. The Wisconsin Supreme Court found relevant the fact that Forster did not keep an inventory. Forster court also said that once Forster found somebody that was interested in an Atlas product, everything then went to the Atlas side of the fence. Atlas was responsible for quoting, accepting, denying, or approving owners, in addition to negotiating the terms of sale, making credit arrangements, and collecting the purchase price. That was all on the manufacturer and not the representative. And that, with the exception of perhaps negotiating the price, which PMT did, I'll grant them that, everything else falls squarely within Forster. All the contract relationship, the negotiation, the terms, the shipping, the billing, all was Yamaseke's. So this case is all on squares with Forster. The Forster court thought that Forster's involvement closely resembled those present in EA Dickinson versus Simpson Electric, a 1981 Eastern District of Wisconsin case, where the court held that the plaintiff was not a WFDL dealership because the plaintiff did not take title to or possession of goods from the defendant, did not deliver goods, and did not exchange goods for a price with any third party. That's PMT. It's exactly PMT. This court's John May decision followed Forster in concluding that May was not a dealer because the single most important factor in determining whether an alleged dealer has the right to sell a grantor's goods or services is the dealer's ability to transfer the product itself, or title, or commit the grantor to a sale at the moment of the agreement to sell. Those four people that walked away from Yamaseke, no way PMT could bind them to a sales transaction. Similar to PMT, very similar, in John May, John May performed warranty and non-warranty work. PMT did that. After those sales were consummated between the end line purchaser and Yamaseke, granted, PMT came in. They did the installation. They did warranty work. And they trained some staff at the customer level. But this was an identical issue presented in John May. And the court did not buy into that. It did not adopt a totality of the circumstances type analysis to whether they had the right to sell or not sell. In fact, the court concluded at page 1408 of the decision, while May had a great deal of contact with customers in soliciting business for Norton, submitted orders for Norton's approval, and did warranty work on Norton products free of charge, there was not evidence that it had the ability to bind Norton to a sale at the moment a customer agreed to buy. And the court said, absent this crucial authority, May does not have the right to sell under the Wisconsin Fair Dealership Law. This circuit's decision in Wilburn versus Jack Cartwright Incorporated is in accord. And it's also instructive. The court held it was insufficient for dealership protection. But a purported dealer does, quote, everything to sell the defendant's product but give final approval to the order. The court further distinguished between a true dealer and a manufacturer's representative. At page 265 of the decision, the court observed, where a dealer purchases goods for resale, he makes the sort of substantial investment contemplated by the dealership law. However, where a sales representative merely solicits orders that are subject to the manufacturer's approval, no such investment has occurred. That's exactly PMT. They solicited orders. Everything then went to Yamaseki. While it is true that Yamaseki never failed to recognize a customer order that Yamaseki never failed to provide a price quote to PMT, those are true. Mr. Wang testified to that. These arguments were rejected by this circuit in the John May decision. The plaintiff there argued much the same. He argued that Nordson never exercised its contractual right or power to reject a proposed sale. The dealer said, hey, they always accepted it. They never rejected none. That was insufficient in John May to find that there was an ability to bind the manufacturer, which is important in order to find a right to sell. Yamaseki legally retained the right to accept or reject these orders as they saw fit. In fact, we've talked about the four situations where customers walked away from the deal because they didn't like Yamaseki's terms. So no authority to bind, no authority to sell. District Court was right, and we request that this court affirm District Court's reasoned analysis and application of forced application of John May. We think that this is controlling precedent based upon the undisputed facts of this case, and summary judgment was proper. If the court has any questions, I'll be happy to answer them.  Thank you, counsel. Thank you, Your Honor. Thank you. The first thing I want to do on rebuttal is address the question of what did Mr. Wang say. And in the appendix on page 125, Mr. Wang in his deposition says, for the PMT case, when we send out a quote, we state what the net price that we have to receive for the machine. Then PMT, they go out, they mark up their price, and sell it to the customer. His words, sell it to the customer. Then when the customer issues me the PO, or the dealer issues me the PO, then we take the difference, the commission, and give it back to them. He quite clearly describes enough to survive summary judgment there. In his own words, he calls PMT exactly what it was, a dealer. That's how they were listed on the website, as a dealer. A dealer that goes out and sells the product. It's important when you, you know, one of the things that troubled me to a certain degree in the argument and in the presentation in this case is there's no appendix that was submitted by Yamasaki in this case. And I'll tell you why I think that is. The answer is simple. Sure, Yamasaki can say, if you submit something on this PO, you've sold it. That's what happened. And sure, some customers can say, we don't want to deal with the Yamasaki PO. And Precision Machine can buy a product and resell it. That is irrelevant to the question of whether or not PMT Machinery Sales is a dealer. Has the ability to sell when the general manager of the very company that's defendant in this case says in his own words, PMT sells it to the customer. How can it be more clear than that, especially on a summary judgment motion? Now with respect to, there was a lot of time spent on the John May case. And there's a really important reason I want to turn to John May right now. And in the John May case, this court specifically said simply because John May did more than it was required to do under the contract, and the things it did more than it was required to do under the contract, was warranty work, was training, was other work. Those things were beyond the contract. In this case, the evidence is undisputed. When PMT sold the machine, they were bound to do the warranty work for a year, to install and train. That was part of the oral agreement, part of the contract. That is part of what makes them the dealer. And what we had in the argument that was just presented to you is a mishmash of the community of interest components of the argument with the right to sell. The right to sell is quite clearly established in the testimony. It is different from what happened in the cases of Forster and John May. And not once did counsel, Fuyamaseki, get up and explain to you how the Benson case doesn't make this a dealership in light of what Benson found to be a dealer. For those reasons, we believe that summary judgment was inappropriate in this case. When you have a very specific statement made by the general manager, confirmed in an affidavit by the plaintiff, that they sold, they had the right to sell, they actually negotiated the sale, that's a dealer. Counsel, is it your client's position that he has a right to an exclusive territory for Yamaseki without any quotas or performance standards? It is my client's position that he was granted an exclusive right by Yamaseki. And under the statute, the only way that that exclusive right could be removed is by notice and opportunity to cure, neither of which were granted in this case. So that doesn't quite answer my question. Is it your position, then, that if a manufacturer is unhappy with a dealer to whom it has granted an exclusive territory without quotas or performance standards, it can introduce those quotas and performance standards unilaterally and say, you've got to meet these. And if you don't, then we'll tell you, we'll give you an opportunity to cure. And then if you don't make it, we'll terminate you. Does that work? The answer to that is, under the statute, the manufacturer cannot unilaterally impose them. They have to be part of the agreement. So the dealer, then, you're claiming a right to an exclusive territory with no quotas or performance standards. That's correct under the way that the contract is here. Indefinitely. As long as we continue to perform under that contract and sell these pieces of equipment, yes. The only way that there could, now, it's not indefinite. Because the statute specifically says that a dealership can be terminated for good cause. One form of good cause is bankruptcy. One form of good cause is if you don't sell. And so it's not indefinite that the dealer still has the right to terminate the dealership, but they have to do so on notice and right to cure and for good cause. All of those are issues that were not reached in this case because the right to sell issue was addressed. Thank you. Thank you, counsel. Thanks to both counsel and the cases taken under advisement.